Robert L. GARNER, Plaintiff–Appellee,

v.

Frank J. SANTORO, Trustee in Bankruptcy of Seaguard Corp., Defendant–Appellant.

No. 87–4538.

United States Court of Appeals, Fifth Circuit.

Jan. 26, 1989.

James N. Compton, Bryan, Nelson, Allen, Schroeder & Compton, Biloxi, Miss., for defendant-appellant.

Paul T. Benton, David T. Cobb, Biloxi, Miss., for plaintiff-appellee.

Before POLITZ, KING and SMITH, Circuit Judges.

KING, Circuit Judge:

Seaguard Corporation appeals a jury verdict awarding compensatory damages to Robert Garner, a former spray painter at a shipyard, for injuries caused by exposure to Seaguard's epoxy paint while Garner was spray painting a vessel under construction by the shipyard for the United States Navy. Seaguard appeals the trial court's denial of motions for a directed verdict, for a judgment notwithstanding the verdict, and for a new trial. The trial court correctly denied these motions. Seaguard also appeals the trial court's refusal to allow

Seaguard to attempt to establish at trial the government contractor defense. On this point, Seaguard fares better, and we remand for further development.

## I.

### A. *Factual Account*

Beginning in 1975, Ingalls Shipyard ("Ingalls") employed Robert Garner ("Garner"), plaintiff-appellee, as a spray painter. Seaguard Corporation ("Seaguard"), defendant-appellant, manufactured and sold epoxy based paints[1] to Ingalls. Ingalls' employees used the Seaguard epoxy paints to spray paint the Iran destroyers which Ingalls was building under contract with the United States Navy ("Navy").[2] Garner testified at trial that he used the Seaguard epoxy paint, beginning in March of 1980, to spray paint the inside of the hulls of the Iran destroyers. In particular, Garner painted in the shaft alley and the number three generator room of the Iran destroyers. Garner stated that the compartments in which he spray painted were approximately six feet by eight feet.

Trial testimony established that in addition to several other toxic substances,[3] epichlorohydrin,[4] also a toxic substance, was in Seaguard's epoxy paints. Because of these potentially harmful substances, Ingalls' employees wore protective equipment while they spray painted with the Seaguard epoxy paints. In addition to the testimony of Willie Epps ("Epps"), Garner's supervisor, that the spray painters wore coveralls, Garner stated at trial that the protective equipment used included rubber gloves, high-top steel toed shoes, a canvas type spray hood, and a respirator with a charcoal filter that fit over the employee's mouth and nose. Further, Garner stated that the employees taped their cuffs and ankle cuffs to prevent the paint from touching their skin. Epps pointed out at trial that the hood had an opening on the face, approximately two and a half inches high and six to seven inches wide, for the eyes. Epps stated further that the opening in the hood had absolutely no type of cover. Underneath the hood, Epps said, the employees wore a cap or a rag around their heads. In addition to the employees wearing protective equipment, Ingalls held weekly safety meetings, which included discussions on how to wear correctly the safety equipment. Epps testified that Garner wore the safety equipment when Garner went "below the decks" and that Garner participated in the safety meetings.

Garner testified that approximately three days after he started working with the Seaguard epoxy paint, he started smelling the fumes of the paint, and he became dizzy. Garner told Epps several times about smelling the fumes, and each time Epps told Garner to come up, catch a breath of air, and go back down to work. As part of the safety procedures, Garner also changed his respirator filter every time he returned to the deck after smelling paint fumes. Epps testified that Garner complained to him about the Seaguard epoxy paint approximately four or five times between April of 1980 and July of 1980. Epps further stated that Garner's complaints about the Seaguard epoxy paint included statements by Garner that the Seaguard epoxy paint was burning his

---

1. Epoxy based paints are used to paint ships because the epoxy resins form a hard, durable surface, which is impervious to water. Since the paint begins to harden as soon as the two parts are mixed together, Seaguard shipped the paint to Ingalls in two separate containers, and the two component parts of the paint were mixed together on the job site at Ingalls. Thereafter, the paint was allowed to sit for one hour to cure.

2. Seaguard alleged that the Navy provided it with a "recipe" for Seaguard to follow to make the paint. Alan Carper ("Carper"), the director of quality control at Seaguard, testified that Seaguard used the Mare Island formula, developed by Navy chemists in the late 1960s at Mare Island Naval Shipyard, for its epoxy paint. Carper stated that this formula of epoxy paint is used extensively for immersion service and to protect the steel on the ships from corrosion.

3. According to Dr. Robert Meeks ("Dr. Meeks"), a biochemical toxicology expert, other toxic substances in the paint included glycidol ethers, high-flash naptha, and imbutyl alcohol.

4. Epicholorohydrin is a reactive molecule, classified as an epoxide and made up of carbon and a strained grain of oxygen.

eyes, throat, and nose. Epps also said that one employee quit because the fumes were so strong and that Garner was not the only employee who complained about the Seaguard epoxy paint fumes. Finally, Epps noted that, personally, he thought that the Seaguard epoxy paint had much stronger fumes than other epoxy paints he had used.

On July 17, 1980, Garner started having headaches, dizziness, stomach nausea, and muscle weakness in his legs. Also, Garner almost passed out. Garner told his supervisor about his problem,[5] who, in turn, told Garner to go to the company hospital, which Garner did. The late Dr. Sol Johnson ("Dr. Johnson"), Garner's family physician, examined Garner, and Garner was hospitalized on July 26, 1980 and released on August 23, 1980. During Garner's hospitalization, Dr. Johnson consulted with Dr. Alfred McNair ("Dr. McNair"), an internist and a gastroenterologist. Dr. McNair examined Garner on July 30, 1980, and testified that on that day Garner was experiencing respiratory problems, anxiety, severe headaches, labile hypertension,[6] severe muscle weakness, and abdominal pain. Further tests by Dr. McNair indicated that Garner had liver and pancreas damage. Dr. McNair, however, found no kidney damage. Dr. McNair testified that Garner continued to have abdominal pain and headaches and was again hospitalized in March of 1981. Between March 17, 1981 and September 17, 1982, Dr. McNair stated that Garner's condition fluctuated and that on September 17, 1982, it became necessary to hospitalize Garner again. Garner was hospitalized from September 17, 1982 to October 1, 1982. As of October 1, 1982, Dr. McNair testified that Garner had chronic[7] hepatitis, chronic liver abnormalities, and chronic pancreatitis. Although Dr. McNair did not treat Garner for a brief period of time, due to Garner's lack of funds, Dr. McNair resumed treatment of Garner, and after October 1, 1982, Garner had hypertension, diabetes, chronic pancreatitis, and hepatitis. Finally, Dr. McNair stated that in his opinion, the toxicity of the Seaguard epoxy paint caused Garner's chronic pancreatitis, his hepatitis, and his liver damage.

### B. *Procedural Posture*

Garner filed suit against Seaguard on August 25, 1982, in federal district court in Mississippi, basing federal jurisdiction on diversity. Garner's theories of liability were based on negligence, strict liability, and breach of implied warranty. He asked for both compensatory and punitive damages. At trial, Garner only proceeded on the theory of strict liability,[8] dropping the other two liability theories and his punitive damages claim, as well.

On August 10, 1984, before trial, Seaguard filed a motion to amend its answer to include the government contractor defense.[9] On October 1, 1984, the district court denied the motion to amend on two grounds: (1) the defense was not timely raised and (2) as a matter of law, the

---

**5.** Epps was not Garner's supervisor on July 17, 1980, since Epps was not at work on that day due to an illness.

**6.** Labile hypertension means that Garner's blood pressure was going up and down.

**7.** Dr. McNair testified that chronic referred to "on-going."

**8.** Though unclear from the pleadings and the trial testimony, Garner's strict liability claim seemed to consist of both a failure to warn claim and an unreasonably dangerous product claim. Although a product can be unreasonably dangerous because of a failure to warn, *see* W. Prosser & P. Keeton, *Prosser and Keeton on Torts* § 99 (5th ed. 1984), Garner's case appeared to treat an unreasonably dangerous

product and failure to warn as two separate theories of recovery under his strict liability claim. This separation is bolstered by the jury instructions and the pretrial order.

**9.** Courts have given this defense several different names, including the government contractor defense, *Bynum v. FMC Corp.*, 770 F.2d 556 (5th Cir.1985); the government contractor's defense, *McGonigal v. Gearhart Indus.*, 851 F.2d 774 (5th Cir.1988) (using both government contractor defense and government contractor's defense); the government specifications defense, *Dorse v. Armstrong World Indus.*, 798 F.2d 1372 (11th Cir.1986); and the military contractor defense, *Shaw v. Grumman Aerospace Corp.*, 778 F.2d 736 (11th Cir.1985). Throughout this opinion, we refer to the defense as "the government contractor defense" or as "the defense."

defense was inapplicable to the case. The district court stated that the defense was inapplicable because "[t]he government contractor's or government specifications defense is not a defense to a strict products liability action, such as this one, in Mississippi." The district court further stated that the defense was inapplicable as a matter of law because "the government defense, where it is recognized, applies only in those cases where the United States would be immune from suit under the Feres–Stencel Doctrine."

On October 9, 1984, Seaguard filed a motion to reconsider its motion to amend its answer, and on December 3, 1984, the district court ordered that Seaguard could amend its answer to include the government contractor defense but that as a matter of law, the defense was still inapplicable for the reasons stated in its order of October 1, 1984. The district court also gave Seaguard leave to move for reconsideration of this decision. Seaguard filed its amended answer on December 19, 1984, and, as to be expected, Seaguard filed a motion to reconsider the district court's ruling of October 1, 1984. After hearing argument on the matter, the district court adhered to its original ruling and opinion on the issue—the government contractor defense, as a matter of law, was inapplicable to the case. On February 15, 1985, Seaguard filed a supplement to its motion to reconsider its motion to amend its answer.

Thereafter, on February 25, 1985, both parties consented to proceed before a United States Magistrate, and on the first day of trial, also February 25, 1985, the magistrate stated that, concerning the government contractor defense, Seaguard was allowed to explain how it knew what the ingredients of the paint were, i.e., if the ingredients were based on military specifications, but that such evidence did not con-

stitute a defense and, furthermore, that a jury instruction to that effect would be given if Garner so desired. The magistrate further noted that he considered the district court's opinion on the government contractor defense the law of the case; thus, Seaguard was precluded from asserting the government contractor defense at trial.

After Garner concluded his case, Seaguard moved for a directed verdict, which the magistrate denied. Seaguard presented its case and rested, and the case went to the jury. The jury returned a verdict in favor of Garner in the amount of $347,003.00. Thereafter, Seaguard filed a motion for a judgment notwithstanding the verdict, a new trial, or a remittitur. The magistrate held a hearing on Seaguard's motion and on July 6, 1987, denied Seaguard's motion.[10] On July 16, 1987, Seaguard appealed to this court, arguing that (1) the trial court erred in denying Seaguard's motion for a directed verdict on the issue of failure to warn, (2) the trial court erred in ruling that Seaguard could not assert the government contractor defense at trial, and (3) the finding that the Seaguard epoxy paint was unreasonably dangerous was against the weight of the evidence and, therefore, evidences bias, passion, and prejudice on the part of the jury against Seaguard, requiring entry of a judgment notwithstanding the verdict or a new trial.

## II.

We first address the government contractor defense. The district court and the magistrate decided that the government contractor defense was inapplicable as a matter of law, and on appeal, "if a question of law is presented, we may decide it *de novo.*" *Byram v. United States*, 705 F.2d 1418, 1421 (5th Cir.1983).

---

**10.** The magistrate issued an opinion on July 6, 1987, giving the reasons for denying Seaguard's motion. The opinion focused on the inapplicability of the government contractor defense, stating that, given the present law, the defense did not apply to the case because Garner was a civilian and Seaguard could not, therefore, meet the first prong of the *Bynum,* 770 F.2d 556, test. For a discussion of this argument, see *infra* section IIB2. The opinion also stated that Seaguard could not meet the fourth prong of the *Bynum* test. For a discussion of this argument, see *infra* section IIB6.

## A. *Elements of Government Contractor Defense*

■ We apply the law as it stands at the time we render our decision. *Bradley v. Richmond School Bd.*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); *Downs v. Director, Office of Workers Compensation*, 803 F.2d 193, 198 (5th Cir.1986). The Supreme Court rendered an important decision on the government contractor defense, *Boyle v. United Technologies Corp.*, —— U.S. ——, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), after the district court's and the magistrate's decisions not to allow Seaguard the opportunity to establish that defense. While the decision below was understandable as the law stood when the decision was rendered, we are compelled to revisit that decision in the light of *Boyle*. In *Boyle*, a United States Marine helicopter copilot, Boyle, was killed when the helicopter that he was flying crashed off the coast. Although Boyle survived the crash, he was unable to escape from the helicopter, and he drowned. Boyle's father brought a diversity action in federal district court and sued Sikorsky, the manufacturer of the helicopter, under two theories of Virginia tort law. The theory applicable here was that Sikorsky had defectively designed the copilot's emergency escape system: the escape hatch opened out instead of in. The jury returned a verdict in favor of Boyle, and the district court denied Sikorsky's motion for judgment notwithstanding the verdict. The Fourth Circuit reversed and remanded, directing the district court to enter judgment for Sikorsky on two bases. The basis relevant to this decision was that, as a matter of federal law, Sikorsky could not be liable for the allegedly defective design of the escape hatch because, on the evidence presented, Sikorsky satisfied the requirements of the government contractor defense. The Supreme Court granted certiorari.

The Court first addressed the considerations which govern the displacement of the state law on which the plaintiff's claim was predicated. The Court noted that the situation in *Boyle* bordered on two areas that the Court had previously found to involve "uniquely federal interests." The first area is the obligation to and rights of the United States under its contracts. The Court noted that though the *Boyle* situation did not involve an obligation to the United States under its contract with Sikorsky, but rather an obligation to third persons, the potential liability, though characterized in tort, arose out of the performance of the contract and was traditionally regarded as sufficiently related to the contract. The other area of federal concern which the *Boyle* situation implicated is the civil liabilities of federal officials for actions taken in the course of their duty. The Court stated that "[t]he present case involves an independent contractor performing its obligation under a procurement contract, rather than an official performing his duty as a federal employee, but there is obviously implicated the same interest in getting the Government's work done." *Id.* 108 S.Ct. at 2514 (footnote omitted). The Court further stated: "We think the reasons for considering these closely related areas to be of 'uniquely federal' interest apply as well to the civil liabilities arising out of the performance of federal procurement contracts." *Id.*

The above discussion by the Court established only that "the procurement of equipment by the United States is an area of uniquely federal interest," *id.* at 2515, and that interest, in turn, "merely establishes a necessary, not a sufficient, condition for the displacement of state law." *Id.* (footnote omitted). The Court went on to say that displacement of state law will only occur where "a 'significant conflict' exists between an identifiable 'federal policy or interest and the [operation] of state law' or the application of state law would 'frustrate specific objectives' of federal legislation." *Id.* (citations omitted). The Court then set forth an illustration of a significant conflict between a federal interest and state law in the context of the government contractor defense. The Court noted that if a federal procurement officer ordered helicopters by model number that *happened* to be equipped with escape hatches opening outward, that would not be sufficient to establish a significant government

interest in that particular feature, and, thus, a significant conflict would not exist. *Id.* at 1216.

The Court then went on to reject reliance on the *Feres* doctrine,[11] *id.* at 2517, as a basis for determining whether a significant conflict exists and, instead, focused on the Federal Tort Claims Act and its exception from suit of claims based upon the exercise or failure to exercise discretionary functions or duties on the part of a federal agency or an employee of the government. The Court expressed the opinion that the selection of the appropriate design for military equipment used by the Armed Forces was such a discretionary function. Finally, the Court agreed with the scope of displacement of state law adopted by the Fourth and Ninth Circuits and listed the three conditions necessary for the defense. The Court said:

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Id.* at 2518. The Court then explained the reasons for each of the elements, noting that the first two elements assured that "the suit is within the area where the policy of the 'discretionary function' would be frustrated," *id.*, and that the third element was necessary to discourage the manufacturer from withholding knowledge of the risks of its product.

Because Seaguard was precluded from virtually any development of its defense, we are unable to say whether the conditions outlined in *Boyle* as to the applicability of the government contractor defense are satisfied in this case, and we are therefore unable to say whether the jury verdict in favor of Garner must be vacated and a new trial held. The matter is further complicated by the fact that Garner asserted two theories of Mississippi strict liability law at trial—the existence of an unreasonably dangerous product and the failure to warn,[12] *see supra* note 8. The jury verdict in favor of Garner is a general verdict, however, and we do not know whether it is based on one or both theories. We address briefly the applicability of *Boyle* to both theories. *Boyle* holds that the government contractor defense can apply to design defects in military equipment, e.g., Garner's unreasonably dangerous product claim. *Boyle*, however, does not address whether a failure to warn claim may be defeated by the government contractor defense. We held in *Bynum* that the government contractor defense could be asserted in failure to warn cases, *Bynum*, 770 F.2d at 574 n. 24; *McGonigal*, 851 F.2d at 777 (holding that *Bynum* is still the law of this circuit with the exception of the portion in *Bynum* that relies upon the *Feres–Stencel* doctrine as a basis for the government contractor defense). We recognize, however, the difficulty that a defendant will have under *Boyle* in establishing an identifiable federal interest or policy in the existence or methods of warning and a significant conflict

---

11. *See Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950) (holding that the Federal Tort Claims Act does not cover injuries to armed service personnel in the course of military service); *Stencel Aero Eng'g Corp. v. United States*, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977) (holding that the right of a third party to recover in an indemnity action against the United States is limited by the *Feres* rationale).

12. We note that under Mississippi strict liability law, a seller has a duty to warn the users of its products of its products' known or knowable dangers. *State Stove Mfg. Co. v. Hodges*, 189 So.2d 113, 118 (Miss.1966) (adopting the doctrine of strict liability embodied in Section 402A of the *Restatement (Second) of Torts), cert. denied, Yates v. Hodges*, 386 U.S. 912, 87 S.Ct. 860, 17 L.Ed.2d 784 (1967). "'[L]ack of an adequate warning, in itself, renders a product defective or unreasonably dangerous within the meaning of products liability law.'" *Gordon v. Niagara Mach. & Tool Works*, 574 F.2d 1182, 1190 (5th Cir.1978) (applying Mississippi law and quoting *Martinez v. Dixie Carriers, Inc.*, 529 F.2d 457, 465 (5th Cir.1976) (citing *Alman Bros. Farms & Feed Mill, Inc. v. Diamond Laboratories, Inc.*, 437 F.2d 1295, 1303 (5th Cir.1971) (applying Mississippi law); *Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121, 126–30 (9th Cir.1968)).

between that federal interest or policy and the operation of state law. *See generally Nicholson v. United Technologies Corp.,* 697 F.Supp. 598, 602–05 (D.C.Conn.1988) (holding that the government contractor defense applies to a failure to warn when no warning was contained in the maintenance manual and the content of the maintenance manual was controlled by the government and was in conformity with government specifications).

On remand, after an adequate opportunity for discovery and upon the proper motion, the magistrate, applying the *Boyle* analysis, may be able to conclude that judgment in favor of Garner or Seaguard is proper on the applicability of the government contractor defense. If the magistrate concludes that no reasonable jury could find that the government contractor defense is applicable to *either* of Garner's asserted theories of liability, then the magistrate should grant partial summary judgment on the issue for Garner, holding that the defense does not apply, and the verdict for Garner will stand. Conversely, if the magistrate concludes that no reasonable jury could find that the government contractor defense is *in* applicable to *both* of Garner's theories, then a judgment notwithstanding the verdict should be entered for Seaguard. Finally, if a fact issue exists on the applicability of the defense to *one* or *both* of Garner's theories of liability, then the verdict should be vacated and the case retried.

**B.** *Disposition of Garner's Objections*

We are able, at this stage, to address and reject certain of Garner's arguments concerning the applicability of the government contractor defense to this case. Garner argues that the government contractor defense is inapplicable to this case for six reasons: (1) because Seaguard has never made an offer of proof on the defense, the trial court may not be placed in error as it excluded no evidence properly presented to it, *see* Fed.R.Evid. 103(a)(2); (2) because Garner was a civilian at the time he was injured, the United States is not immune under the *Feres–Stencel* doctrine, and, therefore, Seaguard cannot meet the first

condition of the defense set out in *Bynum v. FMC Corp.,* 770 F.2d 556, 566 (5th Cir. 1985); (3) no government contract exists in this case; (4) the paint that Seaguard manufactured is not military equipment; (5) Seaguard cannot meet the third element in *Bynum*—that the paint conformed to the government's specifications—because the testimony at trial establishes that Seaguard conducted no analytical tests concerning its epoxy paint; and (6) Seaguard cannot meet the fourth element set forth in *Bynum*—"[that] the supplier warned the United States about the patent errors in the government's specifications or about dangers involved in the use of the equipment that were known to the supplier but not to the United States," *id.*—because Seaguard failed to warn anyone of the epoxy paint's toxic characteristics. We will address each of these arguments in turn.

1. Offer of Proof

█ Garner argues that because Seaguard never made an offer of proof on the government contractor defense, Rule 103(a)(2) of the Federal Rules of Evidence precludes us from finding that the trial court was in error for not allowing Seaguard to assert the defense. Although normally an offer of proof is necessary to preserve a claim of error on appeal, *Mills v. Levy,* 537 F.2d 1331, 1333 (5th Cir.1976), "[a] specific offer of evidence is not needed where an entire class of evidence has been in advance formally declared inadmissible by the trial court during preliminary argument or colloquy, for the court's ruling relates forward to all possible offers of such evidence and renders them needless." 1 J. Wigmore, *Wigmore on Evidence* § 17 (Tillers rev.1983) (footnote omitted). Such was the case here. Well in advance of trial, Seaguard was precluded from presenting the government contractor defense by order of the district court, and that order was reaffirmed by the magistrate during a colloquy on the first day of trial. Thus, Rule 103(a)(2) of the Federal Rules of Evidence does not preclude us from finding that the trial court erred.

### 2. Civilians

■ Garner was perhaps correct in his assertion that Seaguard could not meet the first element of the *Bynum* test, 770 F.2d at 566, because Garner is a civilian and thus the United States is not immune from suit under the *Feres–Stencel* doctrine. *Boyle,* however, effectively eliminated the first element in the *Bynum* test as a basis for the defense for the precise reason that the *Feres–Stencel* doctrine, on which that element was based, was too narrow in that it would prohibit the defense from being asserted against civilians who were injured by military equipment. The Court stated:

> On the other hand, reliance on *Feres* produces (or logically should produce) results that are in another respect too narrow. Since that doctrine covers only service-related injuries, and not injuries caused by the military to civilians, it could not be invoked to prevent, for example, a civilian's suit against the manufacturer of fighter planes, based on a state tort theory, claiming harm from what is alleged to be needlessly high levels of noise produced by the jet engines. Yet we think that the character of the jet engines the Government orders for its fighter planes cannot be regulated by state tort law, no more in suits by civilians than in suits by members of the armed services.

*Boyle,* 108 S.Ct. at 2517. The above language, coupled with the Court's reliance on *Yearsley v. W.A. Ross Constr. Co.,* 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940) (construction contractor not liable to landowner under state law for erosion caused by contractor's work constructing dikes for the government), precludes us from adopting Garner's argument that his civilian sta-

tus automatically prohibits Seaguard from asserting the defense.

### 3. Contract

Garner's attorney asserted at oral argument that since no government contract was involved, Seaguard should be precluded from asserting the defense.[13] We simply state that we do not have enough information to know whether a government contract was involved. The most we know is that a government contract did exist between Ingalls and the Navy. We do not know, however, what that contract entailed, if anything, in regard to the epoxy paint supplied by Seaguard. We also do not know the content of the contract between Ingalls and Seaguard. Because of the lack of available facts on appeal, we are remanding for further development.

### 4. Military Equipment

■ Garner's attorney also asserted at oral argument that the government contractor defense could not apply in the present case because the paint Seaguard made was not military equipment.[14] However, courts have held that the government contractor defense may be asserted when a variety of products are involved. *See Boruski v. United States,* 803 F.2d 1421 (7th Cir.1986) (swine flu vaccine); *Tillett v. J.I. Case Co.,* 756 F.2d 591 (7th Cir.1985) (front end loader); *Brown v. Caterpillar Tractor Co.,* 696 F.2d 246 (3d Cir.1982) (tractor-bulldozer); *Zinck v. ITT Corp.,* 690 F.Supp. 1331 (S.D.N.Y.1988) (night vision goggles); *Casabianca v. Casabianca,* 104 Misc.2d 348, 428 N.Y.S.2d 400 (1980) (pizza dough mixer). At present, we do not decide whether the government contractor de-

---

**13.** Garner's argument could be interpreted to mean that because the Navy does not have a direct contract with Seaguard, Seaguard cannot assert the government contractor defense. Garner cites no case to support this proposition, and we have not found a case which binds us to such a per se rule. Indeed, though not binding, *Schwindt v. Cessna Aircraft Co.,* No. CV 485–472 (S.D.Ga. Aug. 31, 1988) [1988 WL 148433], indicates that a supplier to a company with a government contract can assert the defense if the supplier can meet the conditions set forth in *Boyle.* We, however, only state that given the

limited factual information available to us concerning this defense, in particular what the terms of the involved contracts are, we are unprepared to agree with Garner's argument.

**14.** Garner's attorney cited *Trevino v. General Dynamics Corp.,* 626 F.Supp. 1330 (E.D.Tex. 1986), at oral argument to support his proposition. Although Garner's attorney cites this case for holding that a submarine valve is not military equipment, we do not find such a statement in *Trevino.*

fense applies to any specific product but only state that paint which is used on Navy Iran destroyers specifically because of its anti-corrosive qualities fits within the parameters of military equipment.

5. Testing

Another argument asserted on Garner's behalf at oral argument was that Seaguard could not prove that it met the third element for the government contractor defense set forth in *Bynum,* now the second condition in *Boyle,* because Carper stated at trial that Seaguard did not run analytical tests on its epoxy paint. Thus, Garner argues, Seaguard could not prove that its epoxy paint conformed to the government specifications.

Garner's argument is not persuasive because although Carper did state that Seaguard did not run analytical tests on its epoxy paints, Carper also stated that Seaguard did run tests on the epoxy paint which were required by the government's specifications and that those tests demonstrate whether the paint was properly made, i.e., whether the paint conformed to the government's specifications. We relate Carper's testimony only to refute Garner's argument. We express no opinion as to whether Seaguard can, indeed, establish the second condition in *Boyle.*

6. Warning

Garner next argues that Seaguard cannot satisfy the fourth element in *Bynum,* now the third element in *Boyle,* because Seaguard failed to warn the United States of the toxicity of the epoxy paint. Assuming *arguendo* that Seaguard did not warn the United States of the toxicity of its paint, we definitely cannot say that the toxicity of the paint was a danger of which the United States was not aware, and the test is: "not [known] to the United States," *Boyle,* 108 S.Ct. at 2518. The evidence presented at trial is totally inconclusive as to the knowledge of the United States about the toxicity of Seaguard's epoxy paint. Based on the facts available to us on appeal, we cannot state that Seaguard

will not be able to prove the third element in *Boyle.*

III.

Because the magistrate could rule on remand that the government contractor defense is inapplicable as a matter of law, we dispose of the other two issues that Seaguard raises on appeal. Seaguard argues that the trial court erred in refusing to grant Seaguard's motion for a directed verdict on the issue of failure to warn and that the trial court erred in denying Seaguard's motion for a judgment notwithstanding the verdict or for a new trial because the jury's finding that the Seaguard paint was unreasonably dangerous was against the overwhelming weight of the evidence. For the reasons below, we reject both of these arguments.

A. *Directed Verdict*

In *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969) (en banc) we set out the standard of review for a directed verdict. The standard is as follows:

If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting the motions [a directed verdict motion and a judgment notwithstanding the verdict motion] is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.

*Id.* at 374.

Basically, Seaguard argues that the trial court should have granted its directed verdict motion for failure to warn because (1) the dangers of Seaguard's paint were open and obvious, (2) Seaguard's duty to warn was discharged when Seaguard provided adequate warnings to Ingalls, and (3) Seaguard's failure to warn could not have proximately caused Garner's injury. Adhering to the standard of review previ-

ously set forth, we discuss each argument below.

### 1. Open and Obvious

■ First, Seaguard states that under Mississippi law, a manufacturer or seller has no duty to warn of its product's dangers if those dangers are open and obvious. *See Harrist v. Spencer–Harris Tool Co.*, 244 Miss. 84, 140 So.2d 558, 562 (1962). Seaguard further states that the paint's odor and irritant factor made the danger of the paint open and obvious to Garner. Thus, Seaguard argues, because the danger was open and obvious, under Mississippi law, no reasonable jury could conclude that Seaguard was liable for failure to warn, and, therefore, the trial court erred in denying Seaguard's motion for a directed verdict on the issue of failure to warn.

We do not take issue with Seaguard's statement that Mississippi recognizes the "open and obvious" doctrine in products liability law. *See id.; Gray v. Manitowoc Co.*, 771 F.2d 866 (5th Cir.1985). Instead, we hold that reasonable persons could reach different conclusions, given the evidence presented, as to whether the paint's danger was, indeed, open and obvious.

In *Gray*, the plaintiff, Gray, was injured when a crane boom struck him in the back. Apparently, the crane operator's vision was impaired, causing a blind spot, when the crane was in a certain position, and Gray was injured due to this blind spot. The jury returned a verdict in favor of Gray, and the defendant moved for a judgment notwithstanding the verdict. Expounding on the open and obvious rule under Mississippi law, we couched the issue in the case in the following terms:

> [T]he Grays' right to recover under the theory of strict liability depends upon whether the evidence was sufficient to permit the jury to find that the ... crane was 'dangerous to an extent not contemplated by the ordinary consumer who purchased it, with the ordinary knowledge common to the community as to its characteristics.' "

*Gray*, 771 F.2d at 870 (*citing Ford Motor Co. v. Matthews*, 291 So.2d 169 (Miss. 1974)).

We held that the record did not support the finding that the blind spot was a latent hazard because the evidence presented at trial was overwhelming that the existence of the blind spot was common knowledge in the construction industry. Referring to specific evidence, we noted that the plaintiff's supervisor testified that the existence of the blind spot had been widely discussed at the job site; the business manager of the plaintiff's local union indicated that the left side of the crane was referred to as the "blind side;" the physical evidence and photographs introduced at trial showed that a worker standing in the blind spot could not see the crane operator, thus indicating to the worker that the crane operator could not, in turn, see the worker; and the universal industry practice of using signalers on the ground to guide the crane operators clearly demonstrated the limited visibility of the operators and the dangers associated with those limitations. On the other hand, we stated that the only evidence introduced by Gray to contradict the assertion that the blind spot was an open and obvious danger was the subjective knowledge of Gray himself that he was unaware of the blind spot until after his second accident and the testimony of an inexperienced co-worker that he, too, was unaware of the blind spot. We noted that the obviousness of a product hazard is an objective standard and then concluded that "the testimony of Gray and his inexperienced co-worker did not create a jury question as to the knowledge or expectations of the *ordinary* observer or consumer." *Id.* at 871 (emphasis in original). We therefore held that no reasonable jury could have found that the blind spot was not open and obvious and that, therefore, the district court erred in denying the defendant's motion for a judgment notwithstanding the verdict.

One could argue that the weekly safety meetings held at Ingalls are analogous to the blind spot being "widely discussed at the job site" in *Gray*. The evidence presented at trial regarding the safety

meetings, however, only established that discussions at the safety meetings involved how to wear correctly the safety equipment. In particular, Garner stated that he was trained to wear his safety equipment "below the decks" and that he understood that the purpose behind wearing the equip-. ment "was to keep the paint fumes or whatever from getting into your lungs or whatever." (Question asked by Seaguard's attorney on cross-examination, and Garner responded "yes.") No evidence was presented, however, that the specific dangers of the paint were discussed at the safety meetings. Further, no evidence was presented, as it was in *Gray*, that the dangers of the Seaguard epoxy paint were common knowledge among the workers and in the shipyard industry. Indeed, Epps and Garner both testified that working on the Iran destroyers was the first time that either of them, both experienced workers, had worked with Seaguard epoxy paint. Thus, we think that reasonable jurors could find that the Seaguard epoxy paint was "dangerous to an extent not contemplated by the ordinary [worker] ..., with the ordinary knowledge common to the community...." *Id.* at 870. Certainly, we cannot say that "the facts and inferences point so strongly and overwhelmingly in favor of [Seaguard]," *Boeing Co.*, 411 F.2d at 374, that reasonable persons could not differ as to whether the danger of the paint was open and obvious. Furthermore, we cannot hold that, as a matter of law, the epoxy paint's odor and its irritant factor, by themselves, are sufficient to make the epoxy paint's dangers open and obvious to spray painters. Finally, the trial court instructed the jury that if the epoxy paint's dangers were open and obvious, Seaguard had no duty to warn.

As in *Gray*, we recently addressed the open and obvious doctrine under Mississippi law in *Sprankle v. Bower Ammonia & Chem. Co.*, 824 F.2d 409 (5th Cir.1987). In *Sprankle*, the plaintiff, Sprankle, was walking up a staircase that originated near the defendant Bower's tanks, which stored ammonia gas, and that led to the top of kettles, where pipes delivered the ammonia gas. While he was on the staircase, Spran-kle encountered a pocket of ammonia gas; Sprankle subsequently developed respiratory problems. We affirmed the district court, stating that, as a matter of law, Bower had no duty to warn Sprankle of the dangers of ammonia gas because the "evidence clearly demonstrates that Sprankle was aware of the hazards to the respiratory system associated with inhalation of ammonia." *Id.* at 413. The evidence demonstrating that Sprankle was aware of such a danger included Sprankle's prior refusal to help clean algae from Bower's ammonia tanks because "he knew what he was getting into," *id.* at 412; Sprankle had previously inhaled the ammonia fumes and as a result of those inhalations, Sprankle testified that "you would either have a nose bleed or you would throw up, but it would burn you," *id.;* and Sprankle had read literature that had explained the hazards and toxicology of ammonia.

Viewing the facts and inferences in the light most favorable to Garner, *Boeing Co.*, 411 F.2d at 374, we cannot say that Garner knew of the hazards to the liver and lungs associated with the inhalation of the Seaguard epoxy paint fumes as Sprankle knew of the hazards to the respiratory system associated with the inhalation of ammonia. Unlike Sprankle, Garner was not familiar with Seaguard epoxy paint fumes and did not "know what he was getting into." Further, even when Garner did inhale the Seaguard epoxy paint fumes, Garner testified that he did not know that it was the fumes that were making him dizzy or were causing his breathing problems unlike Sprankle who knew that inhaling ammonia fumes would either cause a nose bleed or cause regurgitation. Finally, no evidence was presented that Garner read any literature on the hazards of epoxy paint. Since the present case is readily distinguishable from both *Gray* and *Sprankle*, we reject Seaguard's argument that the trial court erred in denying Seaguard's motion for a directed verdict because the dangers of Seaguard's epoxy paint were open and obvious.

### 2. Failure to Warn Discharged

■ Seaguard next argues that the trial court erred in denying its motion for a

directed verdict because Seaguard's duty to warn Garner of the paint's danger was discharged by Seaguard's reasonable reliance on Ingalls to instruct Garner of the danger of its epoxy paint. Seaguard states that the material data sheets [15] that accompanied its epoxy paint along with Ingalls' weekly safety meetings were enough to discharge Seaguard's duty to warn Garner of the dangers of the epoxy paint.

Even if Seaguard could discharge its duty to warn by adequately warning Ingalls of the dangers of its epoxy paints,[16] Garner presented testimony that Seaguard did not warn Ingalls of the epoxy paint danger. Dr. Meeks testified as follows:

A. [Dr. Meeks] Well, first of all, the material safety data sheets that were supplied to Ingalls [by Seaguard] did not have all the information on them that I would consider necessary that even Ingalls can make a reasonable assessment as to what the hazard was associated with exposure.

They left off information about what to do in case of a spill. They left off information that the material even contained epichlorohydrin, and they provided no toxicology information in terms of an LD–50, which in toxicology terms is the dose required to kill 50% of the animals in an experiment, and we use it as a relative number to assess the toxicity of a particular chemical, so that information by itself was missing from the material safety data sheet.

Secondly, as I understand it from Mr. LeGrande's testimony, there was no instruction by Seaguard to Ingalls

to make sure that this information was disseminated to the workers.

Given the above testimony, and taking it in the light most favorable to Garner, *Boeing Co.*, 411 F.2d at 374, we conclude that reasonable persons could differ as to whether Seaguard discharged, through Ingalls, its duty to warn. Thus, we find that the trial court did not err in denying Seaguard's motion for a directed verdict.

3. Proximate Causation

■ Finally, Seaguard argues that the trial court erred in not directing a verdict in favor of Seaguard because Seaguard's failure to warn could not have been the proximate cause of Garner's injuries because Garner testified that he had seen paint cans with warning labels on them before and had refused to read them.

First, Seaguard mistakes exactly what was said at trial. Garner never explicitly stated that he had previously seen warning labels and had refused to read them. Instead, the following was stated at trial:

Q. [Seaguard's attorney] Did you ever read the labels on them to see what type of paint it was?

A. [Garner] No, the only thing I see on them was Devoe.

Q. How about as far as the formula, did you ever look to see if it was formula 150, 151, 156 or anything like that?

A. Well, no, I didn't recollect that, they was already mixed for us.

Q. So are you telling me the only thing you looked for on the paint labels of the Devoe paints was for the color?

A. The only thing I seen on them was Devoe.

---

**15.** Dr. Meeks testified as to what a material data sheet, in general, is:

A. [Dr. Meeks] A material safety data sheet is basically a form that has a lot of information on it that pertains specifically to chemicals. It contains information on the physical aspects of the chemical, the rate at which it evaporates, at what temperature it boils, and things of that nature.

It contains information, or it is supposed to contain information as to the toxicology or the adverse health effect that one would expect from exposure to a material, and it also contains information as to what to do if it is

spilled, how you should handle that, what the effects of a spill might be, and also what sort of protective equipment is required, if necessary.

**16.** *See Borel v. Fibreboard Paper Prods. Corp.,* 493 F.2d 1076, 1091 (5th Cir.1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974). ("The seller's warning must be reasonably calculated to reach such persons [the ultimate consumer or user] and the presence of an intermediate party will not by itself relieve the seller of this duty.")

Even assuming that one could take the above testimony as meaning that Garner never read the warning labels on paint cans,[17] Seaguard assumes that the only way to warn the spray painters of the danger of its epoxy paint is through a written label on the paint cans. Dr. Meeks, however, testified that, in his opinion, Seaguard should have put a skull and crossbones on the paint cans, which would account for the education of spray painters like Garner.[18] Seaguard, however, argues that any type of warning on the cans would not have helped to warn Garner because the Seaguard epoxy paint had to be taken from the Seaguard containers and mixed in a container that Seaguard had no control over. First, Garner, although he did not mix the paint, testified that he had seen the labels on the Seaguard epoxy paints; therefore, a warning of some type on the can could have alerted Garner to the dangers of the Seaguard epoxy paint. Also, Epps testified that had the Seaguard epoxy paint cans contained a warning about the paint fumes, Epps would not have allowed Garner to continue working around the fumes. Further, Dr. Meeks testified that Seaguard should have instructed Ingalls to disseminate the information about the paint's dangers to the workers. Thus, taking this evidence in the light most favorable to Garner, *Boeing Co.*, 411 F.2d at 374, trial testimony established that a warning on the Seaguard paint cans could have alerted Garner to the dangers of the Seaguard epoxy paint in one form or another and that alternative ways existed for Seaguard to warn the spray painters of the epoxy paint dangers. Consequently, a reasonable jury could differ on whether Seaguard's failure to warn was the proximate cause of Garner's injuries. Therefore, we find that the trial court did not err in denying Seaguard's motion for a directed verdict on the issue of failure to warn.

### B. *Sufficiency of the Evidence*

Seaguard's final argument on appeal is that the finding that the epoxy paint was unreasonably dangerous was against the overwhelming weight of the evidence and evidences bias, passion, and prejudice on the part of the jury against Seaguard. In particular, Seaguard argues that since it presented testimony that the epoxy paint had less than one part per million of epichlorohydrin in it, it was physically impossible for the epichlorohydrin to cause Garner's injuries. Also, Seaguard argues that since Garner's medical problems differed somewhat from the literature on case studies on the effects of epichlorohydrin, the epichlorohydrin could not have caused Garner's injuries.

"[T]he sufficiency or the insufficiency of the evidence in relation to the verdict is indisputably governed by a federal standard. The standard in this Circuit applied without challenge for more than ten years was announced in *Boeing Company v. Shipman.*" *Fairley v. American Hoist & Derrick Co.*, 640 F.2d 679 (5th Cir. Unit A March 1981) (citation omitted). Under the federal standard, we do not find that the facts and inferences point so strongly and overwhelmingly in favor of Seaguard that reasonable persons could not arrive at the conclusion that the Seaguard epoxy paint was unreasonably dangerous and caused Garner's injuries. *Boeing Co.*, 411 F.2d at 375.[19]

---

**17.** We are doubtful that we would view the testimony this way given that we must evaluate the testimony in the light most favorable to Garner when considering whether the trial court erred in denying Seaguard's directed verdict motion. *Boeing Co.*, 411 F.2d at 374.

**18.** Garner has a ninth grade education.

**19.** The *Boeing* standard addresses the standard for a denial of a judgment notwithstanding the verdict. Though unclear from its briefs and oral argument, Seaguard could be asserting error by the trial court on the trial court's denial of Seaguard's motion for a new trial.

As an appellate court, our review of the grant or denial of a new trial is severely limited; we may interfere only when the court abuses its discretion or fails to exercise it. In light of the trial court's discretion, its freedom to weigh the evidence, and our limited scope of review, we have held in cases reviewing the *denial* of a motion for new trial that the district court does not abuse its discretion—and, *a fortiori*, we may not reverse that decision—unless there is an "absolute absence" of evidence to support the jury's verdict. *United States v. An Article of Drug Consisting of 4,680 Pails*, 725 F.2d 976, 990 (5th Cir.1984)

## 1. Epichlorohydrin Level

Seaguard argues that its experts clearly established that the amount of epichlorohydrin in Seaguard's epoxy paint was less than one part per million. Since the recommended threshold limit value is five parts per million, epichlorohydrin could not have caused Garner's injuries.

First, although Seaguard's experts stated that the epoxy paint only contained one part per million of epichlorohydrin, Carper also stated that Seaguard ran no analytical tests on its epoxy paint. In particular, the following exchange took place between Garner's attorney and Carper:

Q. [Garner's attorney] You don't have a percent epichlorohydrin test, do you?

A. [Carper] No. It is not required.

Q. So you couldn't tell us whether or not that paint coming out of there had five parts per million epichlorohydrin, or 50,000 parts per million epichlorohydrin, could you?

A. No, there's no analytical test that we run that says exactly how many parts per million of epichlorohydrin is in that paint, that's correct.

Given the above testimony, we think that reasonable jurors could conclude that an unsafe amount of epichlorohydrin was in Seaguard's epoxy paint, that Seaguard's epoxy paint was unreasonably dangerous, and that, therefore, the epichlorohydrin was the proximate cause of Garner's injuries.

In addition to the above testimony, Dr. Meeks stated that the other toxic chemicals found in the paint, *see supra* note 3, could cause liver damage. Finally, both Dr. Meeks and Dr. McNair stated that, in their expert opinions, Garner's injuries were caused by Seaguard's epoxy paint. Therefore, the jury's finding that Seaguard's epoxy paint was unreasonably dangerous, despite testimony that the amount of epichlorohydrin in the epoxy paint was less than one part per million, was not against the overwhelming weight of the evidence.

## 2. Garner's Injuries

Seaguard argues next that its epoxy paint could not have caused Garner's injuries because Garner's injuries were inconsistent with the injuries reported in literature on the case studies of the effects of epichlorohydrin. In particular, Seaguard states that the case studies showed that epichlorohydrin caused lung, liver, and kidney damage, and Garner only had liver damage. Also, the case studies showed no pancreas damage associated with epichlorohydrin exposure, and Garner had pancreas damage. Finally, Seaguard argues that the epichlorohydrin would also affect the nose and eyes, and Garner had no complaints about those areas of his body.

First, Dr. McNair testified that Garner did have direct lung irritation on the first day that Dr. McNair examined Garner. Concerning the literature showing that epichlorohydrin does not cause damage to the pancreas, Dr. Arthur Hume ("Dr. Hume"), Seaguard's expert in pharmacology and toxicology, stated that only one study indicated that epichlorohydrin does not cause pancreas damage, and the indication arose because the pancreas was not mentioned as a damaged organ; the study did not explicitly state that epichlorohydrin does not cause pancreas damage. Further, Dr. Hume and Dr. McNair stated that epichlorohydrin deposits itself in the pancreas, and Dr. Hume agreed that because of this tendency to deposit in the pancreas, potential for pancreas damage by epichlorohydrin exists.

As for the argument by Seaguard that Garner had not experienced eye and nose irritation, Epps testified that Garner did complain that his eyes and nose were burning. Further, Garner did have liver damage which was consistent with the literature reporting on the case studies.

In addition to the testimony concerning the individual organs, both Dr. Meeks and Dr. McNair stated as experts, and after

(citation omitted) (emphasis in original); *accord Hansen v. Johns–Manville Prods. Corp.,* 734 F.2d 1036, 1043–44 (5th Cir.1984), *cert. denied,* 470 U.S. 1051, 105 S.Ct. 1749, 1950, 84 L.Ed.2d 814 (1985). As we discuss *infra,* sufficient evidence exists to support the jury's verdict, and we do not find such an "absolute absence" in this case. Thus, Seaguard's motion for a new trial was properly denied.

**644**

reviewing the literature, that they thought Seaguard's epoxy paint caused Garner's injuries. On the other hand, Dr. Hume stated that, in his expert opinion, the Seaguard epoxy paint did not cause Garner's injuries. Thus, we have a "battle of the experts," and the jury "must be allowed to make credibility determinations and weigh the conflicting evidence in order to decide the likely truth of a matter not itself initially resolvable by common knowledge or lay reasoning." *Osburn v. Anchor Laboratories, Inc.*, 825 F.2d 908, 916 (5th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1476, 99 L.Ed.2d 705 (1988). Given the above testimony, we hold that reasonable jurors could find that the Seaguard epoxy paint was unreasonably dangerous and, therefore, caused Garner's injuries.

### IV.

For the foregoing reasons, we find that the district court's and the magistrate's decisions to preclude Seaguard from asserting the government contractor defense, in light of the current law, were in error. We further hold that Seaguard's other claims, relating to the denial of a directed verdict and the sufficiency of the evidence, are without merit. REMANDED for further development on the issue of the government contractor defense. Each party shall bear its own costs.