Angela M. ZINCK, Administratrix of the Estate of Daniel B. Zinck, et al., Plaintiffs,

v.

ITT CORPORATION, United Technologies, Defendants.

Nos. 86 CIV. 2138 (PKL), 86 CIV. 2156 (PKL) to 86 CIV. 2160 (PKL) and 86 CIV. 2185 (PKL).

United States District Court, S.D. New York.

July 15, 1988.

Bailey & Meheen, San Francisco, Cal. (Don E. Bailey, of counsel), for plaintiffs.

Windels, Marx, Davies & Ives, New York City (Edward C. DeVivo, of counsel), for defendant ITT Corp.

## OPINION & ORDER

LEISURE, District Judge:

This is a wrongful death action arising out of the crash of a United States Marine Corps helicopter near Widibon, Korea in 1984. Plaintiffs, the personal representatives of the seven servicemen killed in the crash,[1] brought suit against ITT Corporation ("ITT")[2] in negligence, strict products liability and breach of warranty, alleging improper design and manufacture of certain night vision goggles which plaintiffs contend were the product of ITT. Defendant ITT has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

At issue in this motion is whether defendant ITT is protected from liability for any failure of the night vision goggles allegedly related to the cause of the crash. Defendant claims to be immune from liability, as a matter of law, due to the government contractor defense. For the reasons stated below, defendant's motion is granted.

## FACTUAL BACKGROUND

The following facts are derived from the memoranda, affidavits, exhibits and Local Rule 3(g) statements[3] of the parties submitted to this Court.

The technology for night vision goggles evolved out of the United States Government's research and development of night viewing devices in the early 1950's. Tubular devices were first designed but they were unsuitable, due to their size and weight, for head-mounted night vision goggles.

In 1961, ITT began working on these devices. Pursuant to a Government contract and specifications thereto, ITT developed a compact tube realizing the concept of head-mounted night vision goggles. ITT was awarded the contract for the manufacture of night vision goggles which contained detailed technical specifications and all operating and performing parameters. A limited number of night vision goggles were designated for use by the military in Southeast Asia.

The night vision goggles, first completed in 1970, were subjected to laboratory bench tests at ITT to demonstrate compliance with performance specifications, and were subjected to similar tests by the Government's Night Vision Laboratory. Acceptance was based exclusively on the Government's tests. In subsequent field tests by the Government, not specified in the contract and not participated in by ITT, the Government determined that, although the night vision goggles met their specified requirements, they did not provide sufficiently improved vision over the naked eye to make them a viable military product.

Accordingly, ITT's contract was changed to include new requirements and specifications, including technical changes in the lens system. The Government had independently evaluated and implemented all these modifications.

---

1. All actions were consolidated by stipulation so ordered by this Court on June 3, 1987.

2. The claim against co-defendant United Technologies Corp. was discontinued by stipulations so ordered by this Court on March 23, 1988.

3. Plaintiffs failed timely to serve and file their statement pursuant to Local Rule 3(g). Rule 3(g) provides in pertinent part:

    The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.

    All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

    Rule 3(g) of the Local Civil Rules for the Southern District of New York. Failure to file a timely Rule 3(g) statement may be deemed an admission of the facts set forth in ITT's 3(g) statement. In any event, it is unnecessary for the Court to apply this concept because plaintiffs have failed to show in any papers submitted in this case that there is a genuine issue of material fact that would preclude entry of summary judgment for ITT.

The new night vision goggles were fully tested by ITT and subsequently by the Government and were accepted by the Government as being in full compliance with contract requirements. The Government subjected these night vision goggles to further testing, demonstrating their field suitability. ITT did not participate in these tests.

The night vision goggles have been in full production status by ITT since the mid-1970's. The Government has assigned inspectors to the ITT facility where the goggles are manufactured, to supervise the testing and to verify compliance with the contract requirements.

On March 24, 1984, Daniel B. Zinck, Jeffrey J. Acquisto, Herman L. Osceola, John R. Liddle, David C. Higgins, Anthony S. Dugas, and William A. Soles were aboard a United States Marine Corps helicopter engaged in training exercises in the Republic of Korea. The servicemen were killed when the helicopter collided with a mountain range. The plaintiffs contend that the pilot of the helicopter was wearing night vision goggles manufactured by ITT, that this equipment failed, malfunctioned and became inoperative, and was the proximate cause of the collision.

Although defendant disputes that the goggles were manufactured by ITT,[4] and were the cause of the accident, for the purpose of this motion, it has agreed to put aside both of these issues. ITT contends that it is nevertheless shielded from liability by the government contractor defense.

## DISCUSSION

### I

The United States Supreme Court has recently endorsed the use of the government contractor defense to shield military contractors from liability for design defects. *Boyle v. United Technologies Corp.*, — U.S. —, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). The government contractor defense grew out of the historic principle of sovereign immunity. When a contractor acts under the authority and direction of the United States, it shares in the immunity enjoyed by the Government. *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940). The application of this principle in a military context is even more sound because the government contractor defense serves not only the historic purpose, but it promotes and protects both the separation of powers and the military procurement process. *Tozer v. LTV Corp.*, 792 F.2d 403, 405 (4th Cir.1986), *cert. granted*, — U.S. —, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1987). The origins and area of application of the government contractor defense are uniquely federal in character, involving national, and not local, interests. Therefore, state law is displaced and the defense is governed by federal common law. *Boyle v. United Technologies Corp.*, — U.S. at — – —, 108 S.Ct. at 2512–19.

### A.

According to the structure of our system of Government, the judicial branch is the most removed from military matters. Because it has no department or committee with expertise in this area (unlike the other branches) it is axiomatic the judiciary is uninvolved in strictly military concerns. "The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches." *Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973) (emphasis in original). *See also, Shaw v. Grumman Aerospace Corp.*, 778 F.2d 736, 740–41 (11th Cir.1985).

The design of sophisticated equipment to be employed in Marine Corps aviation, as in the present case, is clearly a military matter. "The decisions of whether, when, and how to use a particular weapon, are uniquely questions for the military and are

---

**4.** The Government employs other contractors, in addition to ITT, for the manufacture of this equipment. Plaintiffs offer no support for their contention that ITT manufactured the goggles used by the crew.

exempt from review by civilian courts." *In re "Agent Orange" Product Liability Litigation,* 534 F.Supp. 1046, 1054, n. 1 (E.D.N.Y.1982).[5] Judges and jurors are hardly qualified to make these judgments. Furthermore,

> [T]here is a danger in transporting the rubric of tort law and products liability to a military setting and military technology.... "[T]he United States is required by the exigencies of our defense effort to push technology towards its limits and thereby to incur risks beyond that would be acceptable for ordinary consumer goods."

*Tozer,* 792 F.2d at 406 (quoting *McKay v. Rockwell International Corp.,* 704 F.2d 444, 449–50 (9th Cir.1983) *cert. denied,* 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984)).

Similarly, servicemen stand in a different position from ordinary civilians. The nature of their work implies exposure to danger. The risks are generally known to them before they join the military and their expectation of safety is much lower. This is, in part, a justification for the Government's immunity, with respect to members of the armed forces, under the Federal Tort Claims Act. This rationale points to the need to keep products liability and tort law out of *all* military settings. *Tozer,* 792 F.2d at 407.

The existence of the government contractor defense does not imply that decisions of equipment safety should not be subject to scrutiny. Such scrutiny, however, should come through executive and legislative channels on behalf of the public at large and not, as here, by individual members of the armed forces through the judiciary. "While debate over the safety and necessity of advanced weaponry is essential, the First Amendment does not require that the forum be the courtroom or the vehicle be a lawsuit." *Id.* at 407.

### B.

In the absence of the government contractor defense, the military procurement process could be affected in research, development and design, and increase in the cost of weaponry and equipment. *Boyle,* —— U.S. ——, 108 S.Ct. at 2514–16. The "continuous back and forth" between the military and the contractor is integral to this process, *Koutsoubos v. Boeing Vertol,* 755 F.2d 352, 355 (3d Cir.1985), *cert. denied,* 474 U.S. 821, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985), and it is important for this relationship to continue in order for military technology to benefit from the advances of science. Contractor input would likely diminish if the fear of liability were introduced.

The second danger is the increase in the cost of military equipment. "[M]ilitary suppliers, despite the government's immunity, would pass the costs of accidents off to the United States through cost overrun provisions in equipment contracts [and] through reflecting the price of liability insurance in the contracts." *McKay,* 704 F.2d at 449. This would contravene the purpose of governmental immunity for military accidents. *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 673, 97 S.Ct. 2054, 2059, 52 L.Ed.2d 665 (1977). The Fourth Circuit stated in *Tozer:* "While distribution of the costs of mishaps to the consuming public may be a familiar feature of products liability law, we are loathe to grant courts and juries a similar power to swell the public costs of meeting the nation's requirements in national security." 792 F.2d at 408.

### C.

The Supreme Court of the United States recently analyzed the legal bases for, and the policy considerations behind, the government contractor defense, and clearly endorsed its use. *Boyle,* —— U.S. at ——, 108 S.Ct. at 2510–12. The Court adopted the tripartite test set forth by the Ninth Circuit in *McKay,* which lists the elements a defendant must prove in order to avail

---

5. The definition of weapon is more than sufficiently broad to include night vision goggles.

*See Shaw,* 778 F.2d at 740, n. 6.

itself of the government contractor defense:

(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Boyle,* —— U.S. at ——, 108 S.Ct. 2516–18. This explication of the components of the government contractor defense represents the final authority on the matter and is thus the standard that this Court shall apply.

On a motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure,[6] the party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The burden on the moving party will be "discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554. The burden then shifts to the nonmoving party to show that there is a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The Supreme Court has noted that the "[s]ummary judgment procedure is properly regarded, not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which were designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed.R.Civ.P. 1) (citation omitted). "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) (citing *Anderson,* 477 U.S. at 247–49, 106 S.Ct. at 2509–10; *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985)). The mere possibility that a factual issue may exist, without more, will not defeat a motion for summary judgment. *United States v. Potamkin Cadillac Corp.,* 689 F.2d 379, 381 (2d Cir. 1982).

When "a motion for summary judgment is made … an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See also First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). Similarly, the Second Circuit stated in *Securities and Exchange Commission v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978), that the "policy favoring efficient resolution of disputes, which is the cornerstone of the summary judgment procedure, would be completely undermined if unsubstantiated assertions were sufficient to compel a trial." *See also Attorney General v. Irish Northern Aid Committee,* 668 F.2d 159 (2d Cir.1982); *Feick v. Fleener,* 653 F.2d 69 (2d Cir.1981); *Friedman v. Beame,* 558 F.2d 1107 (2d Cir.1977).

Courts are particularly indisposed to allowing conclusory allegations to defeat summary judgment after there has been, as here, opportunity for discovery. *See, e.g., Weit v. Continental Illinois National Bank & Trust Co.,* 641 F.2d 457, 464 (7th Cir.1981), *cert. denied,* 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982) (bank

---

**6.** Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

antitrust); *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.,* 748 F.2d 729, 740 (2d Cir.1984) (fraud and misrepresentation); *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 10 (2d Cir.1983) (insurance coverage determination).

■ Where it is clear from the evidence presented to the court on a motion for summary judgment that the movant would be entitled to a directed verdict, should the case proceed to trial, the motion may properly be granted. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. "An opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify denial of the motion." *Neely v. St. Paul Fire & Marine Ins. Co.,* 584 F.2d 341, 344 (9th Cir.1978). While summary judgment is improper when sufficient evidence supporting a factual dispute exists, and would require a trier of fact to resolve the parties' differing versions of the truth, this evidence must be "significantly probative" of the disputed fact. *Cities Service,* 391 U.S. at 288–90, 88 S.Ct. at 1592–93. Having reviewed the standard for granting summary judgment, the Court now turns to a consideration of whether that standard has been satisfied in the instant case.

1. *The United States Government established the specifications for night vision goggles.*

■ As discussed, *supra* at 1332–33, the Government was directly and actively involved in developing night viewing devices ten years prior to ITT's involvement with the process. Affidavit of Edward E. Firth, Project Engineer of the Night Vision Laboratory of the United States Army, annexed as Exhibit A to Notice of Motion (hereinafter "Firth Aff."), sworn to on September 2, 1987, ¶¶ 3, 8; Affidavit of George S. Giffin, Project Engineer and Program Manager for ITT, annexed as Exhibit B to Notice of Motion (hereinafter "Giffin Aff."), sworn to on September 2, 1987, ¶¶ 8–10. The Government initiated the entire program and controlled the design phases. The Government was exclusively responsible for drafting and approving the specifications for the night vision goggles and had the sole discretion to modify them. Firth Aff. ¶ 13; Giffin Aff. ¶ 20. The history of the development of these goggles demonstrates that the Government made all decisions and devised all standards. Firth Aff. ¶ 14; Giffin Aff. ¶¶ 26–27.

Although plaintiffs assert that "plaintiffs' investigation reveals that defendant ITT participated in the designing of the night vision goggles which were in use at the time of the crash," Responding Parties' Statement Pursuant to Rule 3(g) ¶ 2, they do not support this assertion with affidavits based on personal knowledge, as required by Rule 56(e) of the Federal Rules of Civil Procedure. *See Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988). Rule 56(e) provides in pertinent part:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

> \*     \*     \*     \*     \*     \*

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Even accepting plaintiffs' assertion that ITT participated in the design of the night vision goggles, all ITT must show to satisfy the first prong of the defense is that the Government approved reasonably precise specifications. *Boyle,* —— U.S. at ——, 108 S.Ct. at 2516–18. Plaintiffs have produced no affidavits by persons with personal knowledge with which to support their claims. Accordingly, ITT has established the first element of the government contractor defense.

**2.** *ITT manufactured the goggles in compliance with the Government's specifications.*

The Firth and Giffin Affidavits describe in great detail the inspection procedures employed by the Government to assure ITT's compliance with the contract. Firth Aff. ¶¶ 14–16; Giffin Aff. ¶¶ 19–25. "It was customary practice to have Government engineers 'looking over the shoulders' of the ITT production engineers at every phase of production because the Government had to completely satisfy itself, through me and my staff, that every specification and phase of NVG development was addressed with full compliance by ITT." Firth Aff. ¶ 15. The Giffin affidavit states that:

> The NVG has been in full production status since the mid–1970's, in full accord and compliance with government supplied drawings and specifications. Government inspectors are assigned in plant for witness of testing and compliance with all requirements and procedures. Each NVG and tube delivered under these contracts is individually inspected by government inspectors and their acceptance by serial number is attested to on a Government Department of Defense form, DD–250.

Giffin Aff. ¶ 19.

ITT has pointed to the absence of evidence to support plaintiffs' case. *See Anderson v. Liberty Lobby*, 477 U.S. at 248–49, 106 S.Ct. at 2510. The plaintiffs have not rebutted this in any substantial manner. They have not identified a particular defect or material deviation from the specifications which is then attributed to the accident.[7]

The question presented, whether or not the goggles were manufactured in accordance with the terms of the contract, is actually the basis for a claim of a manufacturing, rather than design, defect. Properly supported, it would preclude defendant's assertion of the government contractor defense, which is available only against design defect allegations. *Boyle*, —— U.S. at ——, 108 S.Ct. at 2512–14. As a material factual dispute would then exist, denial of defendant's motion for summary judgment would be mandated. However, in order to prevail on that theory, the plaintiffs would have to produce *some* supporting evidence—which they have been unable to accomplish thus far. Since the goggles were destroyed in the crash and all personnel on board were killed, it is apparent that further discovery would be unavailing on this subject. *See* discussion, *infra*, at 1338–39.

**3.** *ITT warned the Government about the hazards associated with the night vision goggles that were known to ITT but not to the Government.*

As stated earlier, the uncontested Firth and Giffin Affidavits demonstrate that ITT did not design the night vision goggles or share in the information that the Government learned from testing. Clearly the Government was alerted to the goggles' limitations during field tests, certainly to a greater extent than ITT was. According to ITT's supporting papers, the Government was using this equipment in flight missions for four years prior to the crash, and would have become aware of any limitations or dangers associated with aviation-related use of the goggles. Firth Aff. at ¶ 17. Although the Giffin Affidavit at paragraph 27 may point to knowledge on the part of ITT of these dangers, it also clearly establishes superior knowledge on the part of the Government, which nevertheless continued to use the equipment.[8] "It is clear

---

**7.** Plaintiffs do not and cannot contend that this inability to uncover facts is due to an inadequate period allowed by the Court for discovery. By Order dated June 15, 1987, the Court granted plaintiffs' motion for a continuance of the motion until further discovery could be completed.

**8.** That section of the Giffin Affidavit clearly establishes that any hazards known to ITT were also known to the Government:

> I learned, in 1971, that the Government had some interest in developing a program for use of the NVGs for aviation.... It is my belief that the Army did conduct a program for the evaluation of the use of the AN/PVS–5 NVG in helicopters and identified the advantages and limitations of the NVG for such use. On the basis of the tests performed by the Government, it is my further belief that the

from the record, in light of all the information received to date, that the government knew as much as, or more than, the defendant.... There is no substantial basis for believing that further discovery will reveal any persuasive information on this subject." *"Agent Orange" Litigation,* 611 F.Supp. 1223 at 1263 (D.N.Y.1985).

The court in *"Agent Orange"* stated:

[A] defendant who claims protection from the government contractor defense must prove each of its elements. A defendant's failure to establish the defense will not, of course, mean that the defendant necessarily will be held liable. As to that defendant the litigation then would proceed to other issues such as negligence, strict liability, general causation, specific causation, and damages.

534 F.Supp. at 1056. Accordingly, the Court finds that ITT has satisfied its burden of proof on a summary judgment motion that the government contractor defense shields ITT from liability for design defects.

## II

### A.

■ The government contractor defense shields a military contractor from liability for design defects only, and not for manufacturing defects. ITT has met its burden on a motion for summary judgment to establish the government contractor defense. For the same reasons that ITT satisfied the second prong of the government contractor defense, plaintiffs cannot prevail on their claim of manufacturing defect. Although the plaintiffs submitted numerous exhibits and affidavits (including excerpts from the affidavits submitted on behalf of defendant's motion), none presented facts that supported their allegations that the night vision goggles worn by the pilot were manufactured by ITT, that they were defective or that they were the cause of the accident. No evidence has been adduced that would enable a finder of fact rationally to choose

among the multiplicity of ways in which the collision could have occurred. The Ninth Circuit stated in *Wolf v. Reynolds Electrical & Engineering Co.,* 304 F.2d 646 (9th Cir.1962), a principle that is still true today:

It is well settled that proof must be sufficient to raise a reasonable inference that the act or omission complained of was in fact the proximate cause of the injury. The verdict of a jury cannot rest on guess or speculation. That defendant's negligence could *possibly* have been the cause is not sufficient. The same rule applies where, as here, the evidence leaves the cause of the accident uncertain. The jury is not permitted to speculate in choosing one of alternative possibilities, but is restricted to reasonable inferences based upon the facts.

*Id.* at 649–50 (citations omitted; emphasis in original).

Even assuming, *arguendo,* that goggles manufactured by ITT caused the crash, plaintiffs have adduced no evidence of a manufacturing defect. Careful review of the case leads the Court to conclude that the meager evidence presented by the plaintiffs here would not support a verdict in their favor. In fact, the plaintiffs have attempted to turn their own failure to elicit any evidence establishing a causal connection between ITT's night vision goggles and the crash into defendant's failure to support adequately its answer and affirmative defense. After listing various hazards associated with the goggles in Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment (hereinafter "Plaintiffs' Memo"), the plaintiffs state: "Defendant ITT has introduced no testimony nor has it produced any documents to establish that any of the hazards recited above caused the accident, whether some other hazard caused the accident, or what, in fact, caused the accident." Plaintiffs' Memo at 5. Plaintiffs would have this Court ignore that it is their burden to establish that ITT's night vision goggles

---

Government approved the AN/PVS–5 for interim use pending the development by the Government of an NVG strictly for avionics purposes. ITT never was privy to the Government's extensive testing, evaluation and development of the Government's avionics program.
Giffin Aff. ¶ 27.

caused the crash. Unrestrained speculation by the plaintiffs as to possible causes of the collision cannot form the basis for a denial of defendant's motion.

Plaintiffs' evidence simply fails to provide enough information from which a fair-minded juror could logically infer the actual cause of the accident.[9] "Parties are entitled to have a determination of their rights rest on more than speculation and guesswork." *Neely,* 584 F.2d at 346.

### B.

Nor can plaintiffs avail themselves of the doctrine of res ipsa loquitur. Under the rule of res ipsa loquitur, a plaintiff's action is not barred despite his or her inability to ascertain the exact cause of the injury. The doctrine permits the finder of fact to draw a rebuttable presumption that the alleged tortfeasor was negligent if the plaintiff can prove that the instrumentality causing the injury, the helicopter in this case, was under the alleged tortfeasor's exclusive control, and that the injury would not ordinarily occur in the absence of negligence. All this can easily be proven by the plaintiffs in this action. However the defendant would then be the United States Government, which is immune from suit—particularly by members of the armed forces. The Court is not unsympathetic to the plight of the plaintiffs and their unfortunate position. However, there is no basis in law upon which they may justify substituting ITT for the Government without a properly supported allegation that ITT was somehow connected with the accident. As stated earlier, the plaintiffs have not been able to do so.

**9.** On similar facts presenting the identical question of law, Honorable George E. Woods, District Judge of the Eastern District of Michigan, held that ITT could avail itself of the government contractor defense, as a matter of law. *Crossan v. Electron Tube Division,* 693 F.Supp. 528 (E.D.Mich.1986). Although, as in the present action, the plaintiffs could not establish ITT's connection with the cause of the crash, plaintiffs in *Crossan* were able to identify ITT definitively as the manufacturer of the night vision goggles worn by the pilot. Nevertheless, the Court granted ITT's mo-

### CONCLUSION

The Court orders that summary judgment be entered for defendant ITT as the plaintiffs have not adequately substantiated their allegations and because ITT properly asserts the government contractor defense as a bar to any liability. The Court hereby orders that summary judgment be entered for defendant. Accordingly, the complaints are dismissed.

SO ORDERED.

tion for summary judgment on the basis of the government contractor defense.

The court held:
Since the goggles cannot be recovered as they were destroyed in the crash, this is all that plaintiffs will ever be able to produce. To allow the question of manufacturing defect to go the jury with such slight factual basis would be simply to invite jury speculation. Summary judgment is therefore appropriate. *See Celotex Corp. v. Catrett,* [477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265] (1968).
*Crossan,* at 531.