Clara **NIEMANN**, Administrator of the Estate of Vincent M. Niemann, Deceased, Plaintiff,

v.

**McDONNELL DOUGLAS CORPORATION, et al.,** Defendants.

No. 85 5528.

United States District Court, S.D. Illinois.

June 22, 1989.

Katrine Patton, Paul Hulsey and Susan Nial of Ness, Motley, Loadholt, Richardson & Poole, Charleston, S.C. and Charles Hamilton, Belleville, Ill., for plaintiff.

Rebecca Jackson, Robert Lancaster and Dennis O'Connell of Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for McDonnell Douglas Corp.

Raymond Biagini, Herbert Fenster and Charlotte Young of McKenna, Conner and Cuneo, Washington, D.C. and John Shepherd of Shepherd, Sandberg and Phoenix, St. Louis, Mo., for General Dynamics.

## ORDER

BEATTY, District Judge.

This matter is before the court on General Dynamics Corporation's (General Dynamics) motion for summary judgment based upon the "government contractor's defense"; McDonnell Douglas Corporation's (McDonnell Douglas) motion for summary judgment based upon the "government contractor's defense"; and McDonnell Douglas' motion for summary judgment based upon the theory that certain asbestos strips which were originally on aircraft produced by McDonnell Douglas

had been replaced prior to the plaintiff's decedent having worked on the aircraft.

## FACTS AND BACKGROUND

Plaintiff herein, Clara Niemann, Administratrix of the Estate of Vincent M. Niemann, Deceased, originally filed this action in state court on August 9, 1985. Initially, the state court action was against eight defendant corporations, six of which were subsequently dismissed from this case, leaving McDonnell Douglas and General Dynamics as defendants. The plaintiff seeks recovery for the wrongful death of her husband, alleging that he died from asbestosis and lung cancer.

The complaint was originally brought in two counts, alleging that the defendants are liable as a result of the design and sale of aircraft containing asbestos chafing and rub strips on pieces of the engine cowling (covering). Count I was a strict liability claim and Count II seeks recovery for negligence based upon design defects and inadequate warnings. On November 2, 1988, this court granted summary judgment in favor of both defendants with respect to Count I, based upon the Illinois Statute of Repose. Ill.Rev.Stat.1985 Ch. 110, ¶ 13–213. The remaining count is based upon the plaintiff's allegations that General Dynamics and McDonnell Douglas were negligent in designing certain aircraft and in failing to warn of potential health hazards with respect to certain portions of the inside of the aircraft engine cowling.

Plaintiff's decedent, Vincent M. Niemann, worked at the Scott Air Force Base Sheet Metal Shop from approximately 1963 to 1980. His position entailed performing repair work on aircraft manufactured by General Dynamics and McDonnell Douglas. The aircraft in question are: General Dynamics' T–29 and C–131[1] and McDonnell Douglas' C–54 and C–118. Mr. Niemann's work also consisted of cleaning and repairing engine cowlings which included replacement of chafing or rub strips. Plaintiff alleges that during the period Mr. Niemann

worked at Scott Air Force Base in the sheet metal shop, he was exposed to asbestos allegedly contained in these aircraft.

Mr. Niemann retired from this position on November, 1980, at age 63. In January of 1984 he was diagnosed as having lung cancer and on June 4, 1984, Mr. Niemann died, at age 68.

General Dynamics manufactured the T–29 and C–131 aircraft from the mid 1940's through the late 1950's pursuant to contracts with the United States Air Force. The last of these aircraft was sold and delivered to the U.S. Air Force in approximately 1956.

McDonnell Douglas originally manufactured the C–54 and delivered it to the Army Air Forces (predecessor of the United States Air Force) during World War II. The last C–54 aircraft manufactured by McDonnell Douglas was sold and delivered to the United States Air Force on January 22, 1946. The C–118 was manufactured and delivered to the Air Force and the Navy from 1949 to 1956. The last C–118 aircraft was manufactured by McDonnell Douglas and delivered to the Air Force on January 21, 1956.

Two of the pending motions for summary judgment are based upon the "government contractor defense," as adopted by the U.S. Supreme Court in *Boyle v. United Technologies Corp.*, —— U.S. ——, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988).

## APPLICABILITY OF GOVERNMENT CONTRACTOR DEFENSE

In *Boyle*, the Supreme Court recognized and set forth the scope, purpose and requirements of the Government Contract Defense.

Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dan-

---

**1.** The plaintiff erroneously designated the aircraft manufactured by General Dynamics as the C–118 and C–131. Apparently, none of the par-

ties dispute that the actual aircraft in question are the T–29 and C–131.

gers in the use of the equipment that were known to the supplier but not to the United States. The first two of these conditions assure that the suit is within the area where the policy of the 'discretionary function' would be frustrated—i.e., they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself. The third condition is necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability. We adopt this provision lest our effort to protect discretionary functions perversely impede them by cutting off information highly relevant to the discretionary decision. *Boyle*, 108 S.Ct. at 2518.

In formulating the Government Contractor Defense, the *Boyle* Court analyzed whether the selection of the appropriate design for military equipment was a discretionary function within the meaning of the exception to the Federal Tort Claims Act (FTCA), which shields the government from liability in certain circumstances.[2] Arriving at the conclusion that the selection of appropriate design for military equipment is within the discretionary function of the government, the Court held that this selection

> often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness. And we are further of the view that permitting 'second-guessing' of these judgments, See *United States v. Varig Airlines*, 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984), through state tort suits against contractors would produce the same effect thought to be avoided by the FTCA exemption. *Boyle*, 108 S.Ct. at 2517–2518.

Thus, the court extended the exemption regarding discretionary functions of the government which is provided by the FTCA to military equipment contractors themselves. The Court's reasoning in so holding was based upon the potential passing of the financial burden of judgments against contractors to the United States itself.

> It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production. In sum, we are of the view that state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a 'significant conflict' with the federal policy and must be displaced.
>
> *Id.* at 2518. (Footnote omitted).

■ The plaintiff contends that the government contractor defense is inapplicable for several reasons. Initially, plaintiff argues that the defense does not apply with respect to these particular aircraft because of the "stock product" exception to the defense. In support of this position, the plaintiff cites the *Boyle* Court's example of a federal procurement officer ordering a quantity of stock helicopters, by model number, which happened to be equipped with the escape hatches opening outward, i.e., the defect which caused the injury in *Boyle*. Under this situation, the *Boyle* Court found that it would be impossible to say that the government had a significant interest in the particular feature, i.e., the escape hatches. *Boyle*, 108 S.Ct. at 2516.

The plaintiff urges that the specifications provided to the defendants were actually the government's way of quoting a "stock number". In support of this position, the plaintiff attaches the deposition of Thayle Flandars Taylor of McDonnell Douglas Corporation, which was taken in a separate

---

**2.** 28 U.S.C. § 2680(a) exempts "[A]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved is abused."

cause of action against McDonnell Douglas. In the deposition, he states that the asbestos used in the aircraft at issue in that case was purchased commercially from Johns–Manville. (See Exhibit 1 to Plaintiff's Memorandum Opposing Motions for Summary Judgment). Further, Mr. Taylor, referring to the thickness and width of the asbestos rub strip, states that the military "doesn't even have this as a requirement of how it should be. There is no military specs for it so we buy commercial." *Id.* From this statement, the plaintiff argues that there was no military specification for the asbestos containing component part on the aircraft at issue. Thus, according to the plaintiff, the government "virtually bought the asbestos-containing aircraft parts 'off the shelf' or 'out of stock'." From this, the plaintiff concludes that the government contractor defense does not apply.

Although the court is cognizant of the "stock product" exception to the government contractor defense, the court is unpersuaded by the plaintiff's analogy. The products at issue before the court are the aircraft themselves, and not each individual component part, nor is this a situation wherein the government merely ordered a quantity of a product. The defendants have presented to the court various declarations and affidavits of persons with actual knowledge of procurement of the aircraft. A review of the supporting documentation to the defendants' memoranda reveals that the government provided the defendants with detail specifications for the design and manufacture of the aircraft. (See Declaration of General Gabriel Disosway, Exhibit 1 to Defendant General Dynamics' Factual Memorandum in Support of its Motion for Summary Judgment; Affidavit of Donald W. Douglas, Jr., Exhibit A to Defendant McDonnell Douglas' Motion for Summary Judgment; Declaration of Mort Rosenbaum, Exhibit 3 to General Dynamics' Memorandum; Exhibit 14 and 15 to General Dynamics' Memorandum; Exhibits 1 through 22 to Exhibit A, Affidavit of Donald W. Douglas, Jr., attached to Defendant McDonnell Douglas' Memorandum in Support of its Motion for Summary

Judgment; Exhibit B, Affidavit of Larry L. Fogg, and the attached Exhibits 1 through 4, to McDonnell Douglas' Memorandum in Support of its Motion for Summary Judgment.) It is clear that the procurement of the aircraft at issue involved a great deal more than merely a procurement officer contacting General Dynamics and McDonnell Douglas to order a quantity of these aircraft, and that the aircraft in question were indeed "military equipment" and not, as plaintiff suggests, merely "stock products."

The plaintiff further urges that the government contractor defense is inapplicable in that the asbestos containing product was of such a commercial nature that there can be no federal interest, and thus no conflict exists between federal and state law. The plaintiff argues that the government must have a significant interest in the particular feature it ordered the contractor to make. (See Plaintiff's Memorandum in Opposition to Motions for Summary Judgment at Page 11). As previously stated, the particular products at issue in the instant case are the aircraft themselves and not, as plaintiff urges the court to find, the pieces of asbestos that was a component of the aircraft. A conflict therefore exists between federal and state law. Through requiring the military equipment to contain asbestos the government exercised a discretionary function. State law would hold a government contractor liable for utilizing asbestos as required by the government contract, thereby placing the contractor in a paradoxical position in relation to these diametrically opposed theories.

It is clear that the selection of the appropriate design for military equipment to be used by the Air Force is governed by federal common law, and the state law must be displaced. *Boyle,* 108 S.Ct. at 2517.

As this court has previously stated, the decision to use asbestos tape in the aircraft is clearly a discretionary decision of the government. (See *Fairchild Republic Company v. United States and the Department of the Air Force,* 712 F.Supp. 711 (S.D.Ill.1988). Thus, under the *Boyle* decision, the use of asbestos strips in these

particular aircraft falls within the government contractor defense, in that this decision by the Air Force to use the asbestos was a discretionary function.[3]

■ The plaintiff further contends that the government contractor defense would not be applicable in the event that the contracts contained a third party liability insurance clause. In support of this contention, the plaintiff states that "it is elementary that before a party can assert the government defense, it *ought* to produce the contract." (Plaintiff's Memorandum in Opposition at Page 9). (Emphasis added). Plaintiff refers the court to a different case involving General Dynamics wherein the contract indeed contained a general liability clause. The plaintiff has failed to present to the court any evidence that such a clause was contained in the contracts involved in the procurement of the T–29, C–131, C–54 or C–118; further, plaintiff fails to cite any authority for this position. Thus, having nothing before the court with respect to such a clause, the court need not consider what effect, if any, a third party liability clause in the contracts would have on the government contractor defense.[4]

■ Finally, the plaintiff argues that the government contractor defense is inapplicable in "failure to warn" cases. In support of this position, the plaintiff argues that under the third prong of the *Boyle* test, the defendants must demonstrate that any warning about the possible hazards associated with a proposed design must be given to the government prior to the approval of the design specifications, reasoning that "otherwise the underlying rationale for the test would be frustrated." (See Plaintiff's Memorandum Opposing Motions for Summary Judgment at Page 14). Although the

issue of whether the government contractor defense should apply in failure to warn cases was not specifically addressed by the court in *Boyle*, this court is of the opinion that the test, as articulated in *Boyle*, includes allegations of a defendant's failure to warn. In order to utilize the government contractor defense, the contractor must prove government approval of reasonably precise classifications, that the equipment conforms to the specifications, and that the supplier warned the government about dangers known to the supplier but not to the government. *Boyle*, 108 S.Ct. at 2518.

The policy behind the government contractor defense, as previously noted, supports the interpretation that the government contractor defense applies in failure to warn cases.

We think that the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of this provision [28 U.S.C. § 2680(a).] It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness. And we are further of the view that permitting 'second-guessing' of these judgments, See *United States v. Varig Airlines*, 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984), through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption. The financial burden of judgments against the contractors would ultimately be passed through, substantially if not totally, to the United States itself,

---

3. It is clear from the record that the decision to use asbestos was made by the government previous to the manufacture of the aircraft in issue. (See Exhibit 1 to post hearing supplemental filing to General Dynamics Corporation's Motion for Summary Judgment; Exhibit 3 to Exhibit A of Factual Exhibits to Memorandum in Support of Defendant McDonnell Douglas Corporation for Summary Judgment Based Upon the Government Contract Defense.)

4. Although it was not necessary, defendant General Dynamics has presented to the court a declaration of W.J. Bullocks, Chief of Aircraft Logistics Support at General Dynamics Conair Division, which states that he has reviewed all the contracts and can testify that they do not contain the insurance liability to third persons clause as the plaintiff suggests would be in the General Dynamics' contracts, based upon the other suit filed against General Dynamics in *Hutchinson v. General Dynamics*.

since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the government-ordered designs. *Boyle,* 108 S.Ct. at 2517–18.

Further, the court stated that "it does not seem to us sound policy to penalize, and thus deter, active contractor participation in the design process, placing the contractor at risk unless it identifies all design defects." *Id.* at 2518.

The liability for failure to warn as asserted herein, i.e., that the contractors failed to warn the government about the hazards of asbestos in military equipment, "would have the same negative effect on military procurement as outlined in *Boyle,* 108 S.Ct. at 2515. Further, the government's decision on the contents of [the aircraft in question] involves the same balancing of technical, military and even social considerations protected in *Boyle. Id.* 108 S.Ct. at 2517." *Nicholson v. United Technologies Corp.,* 697 F.Supp. 598, 604 (D.Conn.1988).

Based upon the foregoing, it is clear to the court that the defendants are afforded the opportunity to utilize the government contractor defense. Accordingly, the court must determine whether the defendants have satisfied the three elements of the government contractor defense, as set forth in *Boyle,* in order to avail themselves of its protection.

## APPROVAL OF REASONABLY PRECISE SPECIFICATIONS.

### DEFENDANT GENERAL DYNAMICS

■ As defendant General Dynamics' Memorandum points out, in the late 1940's and early 1950's the Air Force had already established detailed generic standards and specifications which controlled the manufacture of asbestos-containing parts for use in military aircraft. (See Attachment No. 1 to General Dynamics' Post–Hearing Supplemental Filing to General Dynamics Corporation's Motion for Summary Judgment, MILITARY SPECIFICATIONS Mil–C–7637

entitled "Cloth, Coated, Asbestos" dated March 30, 1953.)

It is clear from the Memorandum, Declarations and documents attached thereto that the Air Force was specifically involved in the preparation and approval of the proposed specifications and drawings for the T–29 and C–131 aircraft. The concept of the aircraft originated with the Air Force, and the Air Force was closely involved in the preparation of the design specifications. (Declaration of William C. Keller, Exhibit 2 to General Dynamics' Memorandum; Declaration of General Gabriel Disosway, Exhibit 1 to General Dynamics' Memorandum.)[5] A formal Air Force review by the Air Force Mock–Up Board of the proto-type T–29 and C–131 aircraft and their specifications was performed. Exhibits 1, 2 and 3 of General Dynamics' Memorandum. The purpose of this mock-up board was to review the design specification package and the prototype, direct changes to the design and ultimately approve the design package. *Id.*

As demonstrated by Exhibit 16, a drawing used for the T–29 and C–131 aircraft, the drawing specifically references the use of asbestos and it further shows that certain aircraft components were made from "fabric 1–16 Neopren impregnated asbestos without wire 40 and wide 95 Johns–Manville." That material explicitly references the Air Force specification entitled Mil–C–7637, Attachment 1 to defendants' supplemental memorandum.

The plaintiff has presented nothing to controvert the declarations and documents referred to in the declarations to demonstrate an issue of material fact with respect to this element of the *Boyle* test. The declarations and documents overwhelmingly prove that there existed reasonably precise specifications for the aircraft and that the Air Force approved these specifications. *Ramey v. Martin–Baker Aircraft Corp.,* 874 F.2d 946 (4th Cir.1989); *Smith v. Xerox,* 866 F.2d 135, 138 (5th

---

**5.** The declarations of Mort Rosenbaum and Irving Eggert demonstrate that there was a continual, back and forth discussion and exchange of technical and engineering information and ex-

pertise between the defendant and the Air Force. (See Exhibits 3 and 4 of General Dynamics' Memorandum.)

Cir.1989); *Trevino v. General Dynamics Corp.,* 865 F.2d 1474, 1480 (5th Cir.1989).[6] *Tillett v. J.I. Case Company,* 756 F.2d 591, 599 (7th Cir.1985); *Nicholson,* 697 F.Supp. at 604; *Zinck v. ITT Corp.,* 690 F.Supp. 1331, 1336 (S.D.N.Y.1988).

## DEFENDANT McDONNELL DOUGLAS

With respect to the first element of the government contractor defense, McDonnell Douglas points out that the use of asbestos in military aircraft designs was commonly approved by the United States Government. Federal specification SS–C–466, approved in 1949, is a government specification for asbestos sheet and tape. Affidavit of Donald W. Douglas, Jr. and Exhibit 5 attached thereto, to McDonnell Douglas' Memorandum. Exhibit 6 to the Douglas affidavit reveals that this specification was in effect until 1955 when it was superseded by SS–C–466a, which governed the quality requirements for asbestos cloth, thread and cloth procured by the federal government. Furthermore, Exhibit 3 to the Douglas affidavit, the handbook of instructions for airplane designers, reveals that asbestos was considered an extremely valuable heat resistant material, particularly in engine and cowling areas. As such, many different military aircraft, including the C–54 and the C–118, repeatedly used asbestos as a heat resistant material, in accordance with Government Specification Mil–G–7021. Douglas Affidavit, Exhibit 9 and 10 thereto.

The use of specific components of the aircraft, i.e., the use of asbestos chafing strips on the C–54 and C–118 aircraft, is called for on drawings for the aircraft. Government review and approval of all the design drawings was required before the contractor could commence production of military aircraft. Details of chafing strip design and materials were among the drawings which were required to be sub-

mitted for approval. Douglas Affidavit at Paragraph 10 and Exhibit 14 thereto.

The government's express approval of the asbestos parts in the design of the cowling assembly is evidenced by the signatures of the Army Air Forces and Navy Procurement officials in the Army and Navy approval blocks of engineering drawing No. 5074617. Douglas Affidavit and Exhibit 17 thereto; Exhibit B, Affidavit of Larry L. Fogg and Exhibits 3 and 4 thereto.

The government reviewed and approved the aircraft design at several stages prior to acceptance. The Army Air Forces, and, subsequently, the U.S. Air Force, maintained at the Douglas Plant a resident representative office, including a staff of engineers and procurement specialists. This group was directly responsible for the day to day supervision of the design and manufacture of the C–54 and C–118 aircraft and served as the liaison between government aircraft engineers at Wright Field and Douglas engineers and manufacturing managers. Douglas Affidavit at Paragraph 17. Furthermore, government engineers and inspectors frequently would visit the facilities throughout the manufacturing process. Douglas Affidavit at Paragraph 16. The aircraft in issue, underwent a final review at Wright Field before the purchase by the government. Douglas Affidavit at Paragraph 15. This review and approval of the C–54 and the C–118 encompassed a review and approval of the engine cowling assemblies, including the asbestos chafing strips. *Id.*

Plaintiff has failed to present the court with controverting affidavits, or other documentation, as prescribed by Rule 56 of the Federal Rules of Civil Procedure to create a genuine issue of material fact with respect to the government approval of the C–54 and C–118 aircraft. McDonnell Douglas has demonstrated that the Air Force developed, participated and approved

---

**6.** Although General Dynamics suggest that the approval might even be no more than a rubber stamp from a federal procurement officer, this court agrees with the *Ramey* and *Trevino* Courts in that approval under the *Boyle* defense requires more than a rubber stamp. This distinc-

tion however is not particularly relevant vis-a-vis this cause of action and General Dynamics in that there is abundant evidence demonstrating the Air Force's involvement in the design, development and production of the T–29 and C–131.

these aircraft throughout the course of the procurement, design and purchase of them. Such activity on the part of the Air Force with respect to these aircraft establishes that the Air Force approval of reasonably precise specifications, and thus the first element of the *Boyle* test has been satisfied by McDonnell Douglas. *Ramey v. Martin–Baker Aircraft Corporation*, 874 F.2d 946 (4th Cir.1989); *Smith v. Xerox*, 866 F.2d at 138; *Trevino*, 865 F.2d at 1479–81; *Tillett*, 756 F.2d at 598; *Nicholson*, 697 F.Supp. at 604; *Zinck*, 690 F.Supp. at 1336.

Plaintiff argues that, in spite of the affidavits, declarations and documentary evidence, the defendants have failed to produce evidence demonstrating the exercise of discretionary judgment in the use of the asbestos-containing components. This allegation is neither supported by controverting evidence, nor is it an accurate assessment of the first prong of the *Boyle* test. The discretionary judgment involved in reaching the *Boyle* defense is the procurement of military equipment. Both defendants have demonstrated that the government exercised this discretion in the negotiations for the aircraft. The first prong of the *Boyle* test, therefore, requires that the government approve the reasonably precise specifications for *the aircraft*, and not, as plaintiff argues, for each individual component of the aircraft. *Boyle*, 108 S.Ct. at 2517–18; See Exhibits to Defendants' Memorandum in Support of Motions for Summary Judgment.

The evidence before the court clearly demonstrates that there is no genuine issue as to material fact that the defendants have satisfied the first requirement of the *Boyle* test, i.e., that United States, vis-a-vis the U.S. Air Force, or its predecessors, approved reasonably precise specifications for the T–29, C–131, C–54, and C–118 aircraft designs.

## CONFORMING EQUIPMENT

■ Turning next to the second prong of the tripartite *Boyle* test, the defendants must show that the equipment conformed to the reasonably precise specifications which were approved by the United States. Although the plaintiff argues that "prong 2 of the *Boyle* test disallows the defense where it is determined the product does not conform to the specification previously approved by the government," the plaintiff has failed to produce any evidence to controvert the undisputed evidence that the government was involved in and oversaw the production of these aircraft. In addition to approving the specifications, the government accepted the aircraft as produced. Nothing in the record indicates that the aircraft did not conform to the specifications as approved by the government. See Affidavit of General Gabriel Disosway, Exhibit 1, Declaration of William Keller, Exhibit 2, Declaration of Mort Rosenbaum, Exhibit 3, Declaration of Irving Eggert, Exhibit 4, Declaration of Stan Berling, Exhibit 5, Declaration of William Fox, Exhibit 6, all of which are exhibits to General Dynamics' Memorandum in Support of its Motion for Summary Judgment; Affidavit of Donald Douglas, Exhibit A, and its attachments thereto, Affidavit of Larry Fogg, Exhibit B, and the attachments thereto found in Factual Exhibits to McDonnell Douglas' Memorandum in Support of Summary Judgment. Thus, the plaintiff has failed to produce evidence that a genuine issue of material fact exists as to the second element of the *Boyle* test.

## DEFENDANTS' DUTY TO WARN OF DANGERS KNOWN TO DEFENDANTS, AND NOT TO THE GOVERNMENT.

■ The third condition of the *Boyle* test requires that the supplier warn the government of known dangers in the use of the equipment of which the government was unaware. With respect to this element, both defendants have submitted to the court numerous declarations and affidavits which reveal that neither General Dynamics nor McDonnell Douglas was aware of the dangers and risks associated with the use of asbestos in military aircraft at the time the aircraft in question were constructed. Declaration of William Keller, Declaration of Mort Rosenbaum, Declaration of Irving Eggert, Declaration of Stan

Berling, Declaration of Dr. John McCann, Declaration of Manual C. Val Dez, Declaration of Dillman Dimmitt, all attached to General Dynamics' Memorandum in Support of Motion for Summary Judgment.[7] Affidavit of Donald W. Douglas, Jr., Exhibit A to McDonnell Douglas' Memorandum in support of summary judgment.

Furthermore, at the time of the construction of these aircraft, the government was aware of the risks of the use of asbestos, and chose to continue to use asbestos in spite of this knowledge. Deposition of Alvin F. Meyer, Jr. and deposition of Walter Melvin, both of which are attached to the defendants' Memoranda in Support of Summary Judgment.

The plaintiff has presented no evidence which controverts the undisputed fact that the government had knowledge of the dangers of asbestos and that the defendants had no such knowledge. As the wording of the third element of the *Boyle* test reveals, the supplier must have had superior knowledge to the government. "The supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle,* 108 S.Ct. at 2518. This element is necessary because, as the *Boyle* Court pointed out, in its absence,

> the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract that withholding would produce no liability. We adopt this provision lest our effort to protect discretionary functions perversely im-

pede them by cutting off information highly relevant to the discretionary decision. *Id.*

The fact that the defendants had no actual knowledge of the risks of asbestos, while the government was already fully aware of the risks, satisfies the third element of the government contractor defense. *Ramey,* 874 F.2d at 950–51, *Tillett,* at 599, *Nicholson,* 697 F.Supp. at 205; *Zinck,* 690 F.Supp. at 1338.[8]

Under the standard set forth in Rule 56 of the Federal Rules of Civil Procedure and the Supreme Court decision in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the defendants have presented evidence showing that there is no genuine issue of material fact with respect to each of the *Boyle* elements, and the plaintiff has failed to controvert, through affidavits or other documentation, the defendants' evidence in order to demonstrate genuine issues of material fact exist. Accordingly, the defendants' Motions for Summary Judgment based upon the government contractor defense, must be and the same hereby are, granted.

## McDONNELL DOUGLAS' MOTION FOR SUMMARY JUDGMENT BASED UPON REPLACEMENT STRIPS.

■ Although the court has granted summary judgment to the defendants based upon the government contractor defense, prior to these motions, defendant McDonnell Douglas filed a motion for summary judgment based upon the fact that the plaintiff's decedent was not exposed to asbestos from products manufactured or

---

7. Plaintiff contends that because General Dynamics held an ownership interest in Asbestos Corporation Limited, the defendant should have imputed knowledge of the dangers of asbestos. As Declaration of John McGuire demonstrates, General Dynamics' interest in said corporation commenced in 1969, after the construction of the T–29 and C–131 aircraft, and therefore the dangers of asbestos cannot be imputed to General Dynamics based upon this ownership.

8. The *Ramey* Court determined that a showing that the government had knowledge of the dangers is sufficient to establish the third element of the *Boyle* test, without having to address

whether the defendants knew of any risks. "Because we conclude the Navy was already aware of the risk at issue, we need not consider whether Martin–Baker would otherwise have been required to warn the Navy directly of the risk in order to assert successfully a military contractor defense." *Ramey,* 874 F.2d at 951 n. 10. Although the defendants have demonstrated that they had no prior knowledge of the risks, according to the *Ramey* Court, the defendants could have successfully asserted the government contractor defense in the event that they did have knowledge.

sold by McDonnell Douglas.[9] McDonnell Douglas contends that since the asbestos chafing strips were routinely replaced, the plaintiff is unable to prove a nexus between McDonnell Douglas and Mr. Niemann's death.

In support of this contention, McDonnell Douglas has filed excerpts from the depositions of Mr. Niemann's co-workers Coffman, Hewitt, Pinkstaff, Rabenau, and Schrage. Exhibit E to McDonnell's Memorandum in Support of Motion for Summary Judgment. These excerpts reveal that all of the chafing and rub strips were routinely replaced during scheduled aircraft maintenance, at least once every six months.

Mr. Niemann began working at the Air Force base in approximately 1963. The last C–54 aircraft manufactured by McDonnell Douglas was sold and delivered to the United States Air Force on January 22, 1946. The last C–118 aircraft manufactured by McDonnell Douglas was sold and delivered to the United States Air Force on January 21, 1956. Affidavit of Sam Hovsepian, Exhibit C to McDonnell Douglas' Memorandum. The plaintiff has failed to controvert these depositions and affidavit to demonstrate an issue with respect to the time of McDonnell Douglas' delivery and the replacement of the chafing strips. Thus, the record is clear that Mr. Niemann did not work on aircraft which contained the original chafing strips supplied by McDonnell Douglas.

The Seventh Circuit has discussed the standard to be used in a strict liability claim under Illinois Law.

> The Illinois Supreme Court adopted the theory of strict products liability in *Suvada v. White Motor Co.*, 32 Ill.2d 612, 210 N.E.2d 182 (1965). In *Suvada*, the court adopted the position taken in Section 402A of the American Law Institute's Revised Restatement of the Law of Torts. Quoting from the Restatement, the court stated:

> "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
> (a) the seller is engaged in the business of selling such a product, and
> (b) it is expected to reach the user or consumer in the condition in which it is sold.
> (2) The rule stated in subsection (1) applies although
> (A) the seller has exercised all possible care in the preparation and sale of his product and
> (B) the user or consumer has not bought the product from or entered into any contractual relation with the seller."
> *Suvada v. White Motor Company*, 32 Ill.2d 612, 210 N.E.2d 182 (1965), quoting *Restatement (2nd) of Torts*, § 402(A) (1964).

Thus, under Illinois Law, 'to recover in strict liability, the injury must result from a condition of the product, the condition must be unreasonably dangerous and the condition must have existed at the time the product left the manufacturer's control.'

*First National Bank of Dwight v. Regent's Sports Corp.*, 803 F.2d 1431, 1435–36 (7th Cir.1986) (quoting *Hunt v. Blasius*, 74 Ill.2d 203, 210, 23 Ill.Dec. 574, 384 N.E.2d 368 (1978).

The uncontroverted affidavit and deposition excerpts reveal that the defendant was not exposed to any asbestos product manufactured by McDonnell Douglas. Although McDonnell Douglas does not dispute that it originally installed asbestos rub strips, the plaintiff fails to show that the rub strips supplied by McDonnell Douglas in fact caused the injury, pursuant to the standard of § 402(A) of the *Restatement of the Law of Torts*, as set forth in *Suvada*. The

---

**9.** General Dynamics Corporation did not file such a motion, however, General Dynamics did raise the point that the original asbestos strips placed in the aircraft were not present at the time Mr. Niemann began working at Scott Air Force Base. Thus, the court assumes that this discussion applies to General Dynamics as well as McDonnell Douglas. See General Dynamics' Memorandum in Support of its Motion for Summary Judgment, Page 10, n. 4.

product supplied by McDonnell Douglas was not in the same form as it was when Mr. Niemann began working on the product. Thus, under the Illinois standard, the product did not reach Mr. Niemann without substantial change in the condition in which it is sold. *Id.*

In opposition to this position, the plaintiff argues that the standard announced in *Sage v. Fairchild–Swearingen Corp.*, 70 N.Y.2d 579, 523 N.Y.S.2d 418, 517 N.E.2d 1304 (1987) should be applied. The court is of the opinion that this reliance is misplaced. McDonnell Douglas neither designed the asbestos strips which were originally used, nor did it design the replacement strips. Hovsepian Affidavit at ¶ 2–3. Thus, under the standard enunciated in *First National Bank of Dwight*, there is uncontroverted documentation and evidence that the unreasonably dangerous condition must have existed at the time the product left the manufacturer's control. *First National Bank of Dwight*, 803 F.2d at 1436.

McDonnell Douglas has sufficiently established that the asbestos which allegedly caused Mr. Niemann's death was not the asbestos which was placed in the aircraft by McDonnell Douglas, and therefore, under the standard of Rule 56 of the Federal Rules of Civil Procedure and the Supreme Court's decision in *Celotex*, McDonnell Douglas would be entitled to summary judgment with respect to this aspect of the instant cause of action.

## CONCLUSION

The totality of the record clearly indicates that the government contractor defense is appropriate with respect to this pending cause of action. The defendants' declarations, affidavits and other documents prove each of the three elements delineated in *Boyle* to establish the defense. The plaintiff has been unable to come forward with evidence to controvert the establishment of these elements. Accordingly, the defendants' Motions for Summary Judgment are well taken, and accordingly, judgment is hereby entered on behalf of General Dynamics Corporation and McDonnell Douglas Corporation and against plaintiff.

IT IS SO ORDERED.